Thank you. Thank you. Recall case number 2023-50515. I'm so sorry, that's the wrong case number. 2023-50444, Robert White v. Patriot Erectors, LLC. An opposing counsel had some sort of when you return to the courtroom. Is this an evidence? It's one page of the exhibits? From the exhibits. Okay. And you have it there? Okay. Is there any objection? Do you concur that that's a page from the exhibits? Okay. Then you can hand them to us then. Thank you. And we'll proceed with the arguments. Certainly. We're perfectly fine. Thank you so much. We're ready to proceed. Right. Good morning, Your Honors. My name is Andrea Johnson. Good morning, Your Honor. And I'm the defendant in this case. We are the appellant. Can we talk about our jurisdiction? Yes. You mean as far as the second notice of appeal, Your Honor? Well, do we have jurisdiction? Is this a final judgment in this case? I believe that it is. Because the district court retained jurisdiction to address front pay. Yes, Your Honor. I think that the case, the order became final on the judge's final order. That's my interpretation of the rules. I could be incorrect, but that's what I think it is. I filed a second notice out of a pure abundance of caution just to make sure my client was covered. So you don't plan to challenge the front pay award on any different grounds? No, Your Honor. I don't. At any later time? Not today, tomorrow, or any later time. Correct, Your Honor. In this case or the other case? The front pay would be applicable in this case, and I am not challenging it in this case, Your Honor. Okay. And you're saying the final judgment was when the actual final judgment? Is it the one that you appealed to for the other case? Pardon me? What was the final judgment that you said the district court did enter the final judgment thereafter and you filed a second notice of appeal? Judge Pittman filed a final amended judgment, I believe in January. I don't have the date in front of me right now. We filed a notice of appeal out of my obsessive compulsiveness to make sure that my client was protected on the appeal, because at the time Judge Pittman entered his, quote, final judgment, which was about six months prior to that, there were open issues, attorney's fees being one, front pay being another. Well, is this in the same appeal, then, as 24-502-40? Because that's the appeal of the amended final judgment, isn't it? It should be in the 502-444, which is the discrimination case. It was misfiled, and that's my fault. Okay. Well, we will sort this out, unless you have anything else that would help us in this. No, and I will say this, that Mr. Simon and I have discussed the issue, and we are of a like mind on this, and you can ask him what his opinion is, as well. Okay, but we have to follow the actual jurisdiction-ish rules, regardless of whether parties agree to avoid, you know. But we'll figure it out. But the only thing substantively relevant to the intervening decision would have been front pay, and you were waiving all appeals with respect to the front pay. And it's your position that the second notice of appeal essentially catches up the final judgment to the prior briefing. Is that . . . Very well. Well, and I'm not representing to you that that's lawful. I'm just representing to you . . . I'm just trying to understand your position. That is my position. Okay. If I did it in error, I apologize to the court. I did my best thinking in order to protect my client, based on what might have been interpreted as an interlocutory judgment before. Having practiced law for a good number of decades, I've seen a lot of cases that are pretty scary in this area, and thankfully, the appellate rules have loosened up some on this issue, and I think that's where we're at today. But, no, we are not appealing the front pay. I just wanted to make sure we were covered for the prior judgment that had been entered. That's all. Okay. So if I confuse the court, I apologize. Unless there's something further on that, we'll pursue your argument on your . . . Did you have something further? I did have a question. Sure. And just to be clear, we're talking about two judgments, correct? The February 27-23 judgment, and then there was a subsequent judgment on June 12, 2023. Is that correct? Yes. There are two different cases. One involves overtime, which is the second case you will hear. Today, we're talking . . . or right now, we're going to be talking about the discrimination allegations that . . . And there's a January also, right? There's a January trial and a February trial. So the cases, there were two different cases that were kept separate. One dealt with overtime. That was tried in January, and then the February trial was on the discrimination issue. And then there was the reservation of the front pay issue after the entry of final judgment with respect to the discrimination case, and the judge decided the front pay issue and then entered a second final judgment with respect to that case, right? So that's the concern with respect to our jurisdiction. So there were three different judgments. One . . . Yes. Well, two in this case, and then one in the case they'll argue. I will say this. In the first judgment, to be technical about it, Judge Pittman did not reference Rule 54 in there. He references 58. 54 would allow him, as the Court knows, to enter if he exposes the reasons. That wasn't in there. Having gone this . . . I mean, it was out of an abundance of caution to make sure we were okay. Sure. Our appellate rules, I think, allow that to be okay. Okay. How is the first judgment a final judgment, however, if it did not determine an outstanding issue, the issue being of whether an award of front pay was appropriate, one, and if so, what the amount was, two? That seems to be more than a ministerial duty. So can you address why this very first judgment is a final judgment for purposes of the Court's appellate jurisdiction? I can say this from my knowledge base, and having been many moons ago a law clerk and looking up many things like this, and it's been a long time, I can say that it was final. I believe there's an appellate rule, might be four, I'm not sure right now off the top of my head, that basically says if something was not final at the time, issues left open, once those issues get closed out, then it becomes final. And if you would like me to send in a letter brief on that, I will. That's what I can tell you, Judge Ramirez. And I certainly understand the issue of jurisdiction. Jurisdiction is first. It's the prima. You don't get to the second base without it. When I mentioned clerkship, I was a clerk to a trial court judge, and that was the thing he talked about every day. I didn't do appellate work. I'm here today defending this case on behalf of my client, and that's what I can tell you as far as what I understand the rules to be. It sounds like you're conceding that the February 27, 2023 judgment was not a final judgment and that the final judgment was the second one that included the front pay, which I misspoke earlier, which was the February 26, 2024 judgment. If I may just correct the judgment—I may have them wrong. The initial judgment, yes, I'm not sure it was—I thought it was interlocutory. I filed an appeal because I want to make sure my client's protected, and it said final judgment. We attorneys go a little bit crazy when we see things like that, and the argument went on. We had actual briefing on front pay. There was a minimal amount of front pay that was included in the original judgment, I think, but there was a big issue that the trial court dealt with, which was denied in the amended final judgment. I would say that that is the final judgment, yes. You filed an appeal from that? I did. Just to make sure that it would cover the first appeal, like to relate back all of the whole thing? Yes, Your Honor. Okay. And that's not technically being consolidated with this one or anything? Where is that? Where is the appeal of the second February 2024 judgment? I mean, presumably there's a briefing order that the clerk's office is sending you and— Or maybe not. I have not received it yet. Okay. Okay. I don't know the answer. So you would—if we had authority to, you would ask us to consolidate that appeal with this appeal— Yes. —if we had authority to do so? If you do, I totally, 100 percent understand if you don't. And the reason I say do, because of efficiency. We've been through this a long time, and we're here. Let's go do it today. Okay. We're ready to hear your argument, and we'll give each side an additional three minutes because you're going to have to address jurisdiction two. Thank you, Your Honors. So I'm the defendant in the case. We lost in front of a jury. We didn't lose everything. We got our finding on retaliation. We did not get a good finding on discrimination. In a sense, relatively speaking, when you see a lot of these cases, the damages were a little bit on the limited side, although it hurts still to get them. But there's not enough evidence for the jury verdict to hold on the discrimination deal. Mr. White worked for my company for 10 years. He came in as an ex-con. He got promoted up. He got lots of raises. He was treated with respect. He had basically the entire shop. He had, at one point, over 100 people that he supervised. People trusted him. They liked him. They bonused him. It's not a case about discrimination. It is a case about discrimination. Even if all of that were true, the issues raised by Mr. White that constituted the discrimination were presented to the jury, and Patriot was able to present its nondiscriminatory reasons, evidence with respect to that. Then Mr. White was able to put on evidence of pretext, and the jury decided what it did, and apparently did so very intelligently by distinguishing between the retaliation claims and the discrimination claims. How come this isn't just we rely on the jury's assessment of the facts and uphold the jury verdict? Because, Judge, this case either makes or breaks on the issue of pretext, in my view. Pretext, as the Court well knows, requires substantial evidence. That evidence does not exist in this case. Whether a jury thought maybe Mr. White was not treated fairly, in a sense, is not issue of discrimination. What was he not ... How was he discriminated against? What's the evidence that he was discriminated against in his ... At this time, we did not have such a broad understanding of what it was to be discriminated. Now, we have an even broader ... You can be discriminated against even for breaks and all kinds of things. The law has changed, and I'm not critical of that. I'm just saying it's different than at this time in this case. What is the claimed discrimination? I saw that there were claimed racial epithets by co-workers that were reported, and then they were investigated, but nothing was done because they determined ... They couldn't tell if they'd happened. What is the discrimination in the ... Was there any tangible job detriment or any job detriment whatsoever? What happened in this case, Your Honor, has to be looked at in the context of this. Patriot, in 2019, was acquiring a company called Trinity. I tell you that because if anybody that has ever worked in a company where there is a reorganization of several hundred, if not thousands of people being pushed together, it's somewhat chaos. It was even described like that in the transcript. What does it have to do with Mr. White? Mr. White was moved. He was moved like Mr. Herzog, a white person, Mr. Swore, a white person, and many other people that are in our brief, all of them not his race. The company was trying to find where all the chess players should be put in this reorg. We have a company coming in that is the manufacturing expert in this area, Trinity. Patriot is an erector company. It's like three-fourths of his business is going out and building skyscrapers that some may be even here in this city. The fabrication portion is the little portion, like the tail of the dog, so to speak. It's an important portion, and it grew over time. Mr. White came in, was given all these advantages, even as an ex-con, got promoted, was treated well, could do private things on property, brought in his family members. They were solicitous of him in many, many, many ways. What happened is he was moved, Your Honor. I'm sorry. They moved him out of the department he had been in, so that's the discrimination? Because they didn't train him on the Tecla software, and that's because he didn't know how to use it, and that's why he was moved out of that department? Yes, Your Honor. What happened is he's told he's being moved. He meets with his friend, a guy he said he loved, a company he said he loved. He meets with Mr. Dixon, and Mr. Dixon gives him three different options. There is no debate in the transcript that these options were given to him. Mr. White, we... There is debate as to whether they were realistically available, though. Isn't that correct? Judge, I would disagree with you. Well, there was evidence presented by the other side that you might disagree with, but there was evidence with respect to that, wasn't there? The evidence is, Your Honor, that on days later, reportedly, Mr. Dixon took the job away. I agree with you on that portion, but if you look at the evidence, at the time Mr. Dixon meets with him, he could have gotten another job in sales. Same benefits. He might have gotten a job in one of the private equity groups that they had out there, and they were also talking about him starting his own business as a fab shop person, which is what he did. If I may direct the Court to, and I didn't make a copy of it, but it's in the record, all the text messages following this meeting are things like, and this is from Ted Turner, another manager, all of us truly hope you decide to continue the relationship with us through one of the options Parley outlined. We want you to stay. We want you to consider one of these issues. He asks in another text a few days later, well, do you want me to give up my gas card and, I don't know, gas cards, I think it was, says this to Parley, or do you think I might need that in sales? That's Mr. White's words to the company. Response back from the CEO, his friend. You just keep those things for the time being. What happens immediately after that, Your Honor, is he goes out, he meaning Mr. White, and he chooses his course. It's not Patriot that is leading the way, it's Mr. White. He makes an application to the Secretary of State to start a business, and he doesn't do anything in addition to that, like go out and hire employees, like terminate his relationship with Patriot. He doesn't do any of that. He just gets a name from the Secretary of State. Isn't that correct? He goes out. I would say that it's more than just a name. He filed a certificate of operation for a company called Phoenix within a week of the time that he talked to Mr. Dixon. After that time, because that's one of the three options that was given to him, right? That was one of the options he could have considered. And he was considering it. He was considering it, and he went in that direction. And then the job offer from Patriot, when Mr. White says, hey, I want to take you up on that, it's no longer available. And wasn't all of the, isn't the point that all of this evidence, your position and Mr. White's position was presented to the jury, and they made a factual finding that this was an adverse employment action, correct? They did make that finding. You're right, Your Honor. But there is no evidence to support the finding in my view. Other than the evidence we just described. The evidence we described is only one little sliver of the evidence. There is no writing from Mr. White complaining about what was going on. He certainly knew how to do that. He had done it many, many times. He never gets with his friends and complains about it. The only thing that we see, Your Honor, is he files an incorporation of a company. He makes a decision to incorporate this company. And every discussion that he has with the company thereafter is what? It is not, I want to continue working here. You guys cheated me or anything like that. It is, help me get my company going. Give me information. He goes to the private equity people, and he asks for the evidence that they have, or not evidence, but information they have, in order to put together a company. We, at Patriot, were led by him, not the other way around. You're saying that there was never a conversation between Mr. White and Patriot personnel asking to stay at Patriot after this counseling between the head of Patriot and Mr. White, where the three options were presented? Are you saying that that conversation never occurred? I'm saying that there is a debate about what happened in the conversation, and I'm with you, Judge. And that debate was presented to the jury. But what I'm saying is this. Even if Mr. Dixon, at some time after, it was like 10 days or later after he had already started his company, and already was in the process of talking about building up the company, building up the company, he's going like a train in that saying, okay, we'll help you in your subfab deal, okay, a debate in the discussion. Even if that had happened, where is the discrimination? How was he discriminated against at that point? Nobody in this process, your honors, at the time that all these players were being moved around, one of the issues was you didn't give him progressive discipline. We didn't give any of these people, white, black, Hispanic, nobody got progressive discipline. Like, if you want to say unfair companies everywhere, or fair companies everywhere, they just were moving people within a reorganization. That is what happened. Yes, your honor. No, I just want to, I think the time is expired, but I don't know if you have any further questions, No, I didn't know if we were in the three minutes. Okay, so we've saved time for rebuttal, and we'll hear from you further on rebuttal. Thank you so much. Can't go without these. May it please the court. Counsel, my name is Kel Simon. I represent Robert White in this appeal. I'm going to address the jurisdictional issue first. Good. So, the timeline, my assistant said, bring the docket sheet to the oral argument. Of course, I didn't. But the timeline is the final You should listen to your assistant. Always. The final judgment was entered February 27th, 2023, but did not include front pay or attorney's fees. Patriot didn't appeal from that. May 11th, there was another final judgment, or actually, May 11th was the order disposing of the attorney's fees issue. It has language that says it's a final judgment, but it references Federal Rule of Civil Procedure 58, and Patriot filed the notice of appeal from that order on June 12th of 2023. Then the court entered its amended final judgment with the front pay included in January of 2024. I've looked at the rules. I'm not confident that this court does actually have appellate jurisdiction. I thought that you agreed with her. We did agree. We've agreed, and I'll explain what I think I agree on. I think the safest thing for the district court to have done would have been to certify the May 11th order under 54B as a final appealable order. It did not do that, but I think Patriot having appealed it and us being here ready to engage on every issue except for front pay, I think probably does give the court jurisdiction over it. What about the January 2024? Was there an appeal from that? There was an appeal from that, and that one we haven't gotten the briefing schedule on or anything. But it's the same exact thing as this, right? Same issues except for front pay is included in that one. So if there was some way to salvage this through that, would you agree that that would be consolidated or do you need time to think about that? Absolutely. No, I would agree that that would be consolidated. I think this case is entirely briefed and about to be argued on everything but front pay. Okay. And to nail that down, counsel opposite said she would waive, that Patriot would waive any issues related to the front pay award. Is that the same for you? Yes. I'm not planning on any appellate work on the front pay. Okay. And we're not saying that this can be salvaged. We're just trying to figure out all the various things. Sometimes you can send it back for them to indicate whether they intended a judgment to be final, and that gives you a limited remand. That's one way to deal with it. There are several options at this point, so we don't run into the, quote, finality trap, which is well documented in our jurisprudence. Yes, Your Honor. Your Honors know way more about all of the appellate things like that than I do. Okay. But from what I can tell, I think we're okay to go ahead. So we may be in the finality trap, but we may be able to avoid it, and you would prefer us to avoid it and decide this case if we can't? Yes, Your Honor. Okay. So let's talk about this case. Okay. I want to first address the question that you asked about what is the discrimination here, and that gets to, I think, two central questions in this appeal. One is, what was the adverse employment action against Mr. White? I was asking that, yes. Sure. And the adverse employment action against Mr. White was that Mickey Swore, who was his new supervisor as of three months prior to his being removed from the job, Mr. Swore came in, had very little interaction with Robert White, and in October of 2019, made the decision to remove Mr. White from the position, production manager, shop supervisor, whatever you want to call it. And Mr. White is told, you are never going to hold that a long line of cases about adverse employment actions. I think that qualifies, but I think especially under the Supreme Court's just-issued decision in the Muldrow v. City of St. Louis case, I think being removed from a job is an adverse employment action. But the adverse employment action deepens because the way that that removal was— What was he offered at that time? There was no offer. What happened was, at the meeting where Mr. White was told he was being removed from the job, he's told, there are several possibilities out there. We might be able to find another position for you. You might be able to come work with one of our affiliates. You might be able to start your own business. But Parley Dixon, who was the president of the company who presented this to Mr. White, was very explicit. Don't make any decisions yet. Don't be hasty. We want you to take a little bit of time and he came back to meet with Parley Dixon, and Parley Dixon said— He's on paid leave? He's on paid leave that whole time. But that's not because of his divorce or something? No. It didn't have anything to do with his— Am I wrong that there's some reference to that being—or is that a different time period? Patriot loves referencing all of the terrible things that Robert White did. Okay. So he's not on leave because of that. He's on leave because they don't yet know what's going to happen to him, but he's still getting his full salary and— Correct. Yes, yes. And we're not going to dispute here that Parley Dixon and Robert go way back. And I think Parley was presenting this to him in a way of, take some time. The divorce question thing is interesting. All of the stuff in Robert's personal life, him having an affair, getting an— I'm not trying to ask any questions about that. I did not ask—I was just asking if he was on personal leave or if he was on some sort of paid leave for the company to figure out what his next offer would be. I'm not trying to deal with his personal life. Okay. I won't go into it then. It was paid leave from the company so that he could figure out and the company could figure out what his future there might be. So Robert goes back three weeks later, meets with Parley, and Parley tells him, I'm sorry, we don't have anything for you. And so Robert decides at that point, I'm going to move forward with Phoenix, the company that I incorporated on October 30th. The reason that he incorporated that company, as Your Honor, Judge Ashby pointed out, it didn't have—it wasn't that he knew that he wasn't coming back to Patriot. He did just establish the corporate certification, but he didn't hire anybody. He didn't set up anything. He didn't get any materials. I'm sorry. I understand now that he's not given another job and so that you've got that part of it. How do we know that that's attached to the discrimination? To the racial discrimination. Yes. Sure. No, that's a really good question. Mickey swore took him out of the job and there's substantial evidence that the reason that he was taken out of the job was because of his race. Both evidence— What is that evidence? Did somebody testify that that was the reason? Sure. So there's multiple forms of evidence that establish discrimination in this case, and primarily it's through pretext. As the jury was instructed, if they disbelieved the reason given by Patriot for their actions, they were free to infer that Robert White was discriminated against. There still has to be some evidence of discrimination in the record. Yes. It's not true that just because you establish pretext that you automatically establish race discrimination. Because how would you know you aren't automatically establishing age discrimination or disability discrimination, all of which are important parts of our discrimination law? I think that's a really excellent question, Your Honor. And the jury instructions, interestingly, the Fifth Circuit pattern charge doesn't say anything about that. The Fifth Circuit There's evidence that the articulated reason is false. The jury may infer discrimination. But in this case— There still has to be a prima facie case. Even if we don't do McDonnell-Douglas burden shifting at trial, you still have to make your prima facie case. Yes. Or else you can get a directed verdict, or JMOL, as we call it nowadays. Exactly. And the prima facie case is established by showing that Mr. White was replaced by a white man in the job by Justin Snyder, and that's— Replaced by a white man to be this— The shop supervisor. With less seniority. Way less seniority, way less experience. The decision-maker, Mr. Sward, knew nothing about Justin Snyder's qualification. He picked him out as a face in the crowd, is how Mickey Sward described it. And there's ample evidence of racial bias infecting that whole decision-making process. What? What mean? We have evidence that at the time that Robert was working there, there were ten black employees. That number went down to one by the time we went to trial in this case. Mr. Sward took Justin Snyder, a white man, put him into Robert White's job, a black man, and in doing so— and this is the exhibit that I've shown you— passed over four highly qualified Latino employees who were in higher-level positions than the white man, Justin Snyder. Mickey Sward effectively leapfrogged Justin Snyder over those four Latino employees and replaced Robert White, a black man, with that white man. Now this gets into the question of— that this court has held many times that discrimination against one minority group can sometimes be seen as discrimination against another minority group. That's cross-category discrimination. It's in Hernandez v. Yellow Transport, 670 F. 3rd 644, and Vance v. Union Planners, 209 F. 3rd 438. Is there any other evidence tying racial discrimination evidence in this record? There is no evidence that Mickey Sward used racial slurs or that— Why is that racial slur thing in this case? Because that's not related to any job. Patriot says over and over again there's no evidence of racial slurs, and so I feel that I need to address it because there doesn't have to be. So that had nothing to do with this at all? You didn't argue that to the jury? I did not argue that to the jury. I argued to the jury that pretext is established through a series of pieces of proof. First, establishing that the articulated reason was false. Second, establishing that Robert White was considered a very good performer at Patriot. He got a $10,000 performance bonus in the same month when he was terminated from his position as a production supervisor. He had gotten a good performance review just prior to being terminated. Were they allowed to argue this reorg theory? Yes. They presented a lot of evidence on this reorg theory to the jury. It was not a reorganization. It's not a reorganization when a supervisor takes one employee, takes them out of a job, and puts another employee in there instead. It's a reorganization when maybe some job functions are changed, job titles are shifted around. Were job functions changed that they had to use some kind of computer software that they were not using anymore and that your client didn't know how to use? This was not a situation where Justin Snyder was put into a different job from the one that Robert White held prior to it. They did institute the use of that Tecla software. That was one of the articulated reasons that Mickey Swore gave for removing Robert White from the job was that he didn't feel that Robert had a buy-in to the Tecla system. But when we went into that with Mr. Swore on cross-examination, he testified that there was nothing specific that he could point to about how Robert wasn't appropriately using Tecla. Robert testified that at his new job that he got after Phoenix folded, he had no problem adopting the Tecla software. There's ample testimony from numerous witnesses that the rollout of the Tecla software was a mess, that Robert's department didn't even get access to or training on the Tecla software because there was no way that they were prioritizing other departments for the trial. With testimony from people that Patriot calls Robert's shop friends, these were three individuals, Condelaria Davila, Mary Ann Ezell, Kaitlyn Reveal, who all came and testified on Robert's behalf. They had worked under him. They refuted, as did Robert, each of the articulated reasons for termination given by Mr. Swore for taking Robert out of that job. So each of the articulated reasons has been shown to be false. I think I'll talk about one of them in particular because I think it's important. Mr. Swore testified that Robert White instilled job fear in the employees that worked under him. Robert said, well, that's simply not true. Mr. Swore, Justin Snyder testified to this job fear idea also. Neither Mr. Swore nor Mr. Snyder could articulate a single employee who had expressed a concern about job fear. And the three witnesses that we called, Davila, Reveal, and Ezell, all testified Robert didn't instill job fear. He didn't rule by fear. He very fairly employed the company's progressive disciplinary policy, but he didn't cause fear in anybody. And that's a theory I think, you know, listened to and held on to just like they listened to all of the other evidence that the articulated reasons were false. Patriot has not offered here any bit of evidence from which we could say there's no way any reasonable jury could have ever found in Robert White's favor. I've got to say, I tell all of my clients, and I represent employees, I tell all of them, we could go try your case ten times. We're going to win it five times. We're going to lose it five times. I never have any way of predicting that sort of thing. This case is not a ten out of ten in Patriot's favor case. Patriot did not introduce evidence showing without any possibility of dispute that they fired Robert from that production supervisor position for a legitimate non-discriminatory reason. And he didn't walk off the job because he didn't have a job at the time of that second meeting. No. What he did was after the first meeting when Patriot told him you're never coming back to this job, they shut off his email, they boxed up his stuff and told him to come and get it, he went ahead and incorporated Phoenix, didn't do anything about it until he went back and met with Parley Dixon. Patriot says that second meeting didn't happen, but Robert White testified that it did happen, and all Parley Dixon could say was I don't remember if it happened or not. So the jury was free to believe Robert's . . . And the money got cut off after the three weeks. Yes, the money got cut off. The three weeks of paid leave was over at that point because at that point there was no job for you here, and so Robert's employment ended. I also want to address, in addition to the falsity of the reasons, that the additional evidence of discrimination is really ground in the treatment of Justin Snyder by Mickey Swore. Justin Snyder, again, he was the least qualified of this pool of candidates, again, leapfrogged over those much more qualified Latino employees. Swore said he didn't consider even talking to a single one of those employees because they had the stink of Robert White on them. But at the same time, he couldn't articulate what it was about Robert that caused him not to talk to any of those other people. The two individuals who reported directly to Robert, who were the of experience at Patriot, to Justin Snyder's two years of experience. Mickey Swore testified that one of the reasons that he promoted Justin Snyder to the shop supervisor job was that Justin Snyder had experience with powder coating and sandblasting. The production manager job is a job that manages 100 or 120 people. It supervises the shop supervisor and the entire floor. Mickey Swore testified that he had no knowledge, even at the time that he selected Justin Snyder for that position, he testified that he had no knowledge of whether Justin Snyder had ever supervised anybody, this less qualified white male who's up for this job supervising 100 to 120 people. Mickey Swore said, I didn't know whether he supervised anybody. I knew that he had powder coating experience and sandblasting experience. Powder coating and sandblasting are not things that are done at Patriot. And if they were done at Patriot, they would have been done by the regular hourly workers working on the shop floor. Those are not things that would have been done by somebody in the position that Justin Snyder was moved into. Mickey Swore also allowed Justin Snyder to sit in his office, sometimes for hours at a time, when Justin Snyder should have been on the floor working, but Mickey Swore allowed him to sit in his office for hours at a time, just shooting the breeze, talking process improvements. And it was during those conversations that Justin Snyder said, I'm interested in this production supervisor job if you ever have the chance to consider me for it. Condolario Davila, who was the night shift shop supervisor with significantly more experience than Justin Snyder, also told Mr. Swore that he was interested in being considered for the position, but Mr. Swore refused to consider him at all, simply never gave him the chance to even talk to him because he was associated with Robert White. And what I think the jury reasonably concluded, although I'm speculating here getting into their head, was that Mickey Swore took this very much unqualified non-minority employee for whom he had a personal preference and put him above these other minority employees and took Robert White out of the job so that he could do that. But what you're not speculating about is that you presented all of this evidence to the jury and Patriot presented all the countervailing evidence to the jury and the jury made its decision. Exactly, Your Honor. I think I've probably gone on long enough. If the court doesn't have any further questions for me, I'll be finished, but I'm happy to answer anything else that the court has. I think we have your argument. Thank you. Okay. Thank you. May it please the court to respond to a few things. I think one thing that's getting smushed here is a timeline. Mr. White was being moved out of his position just like a whole bunch of other people were. A reorg does not necessarily mean you get a new title. You might be put into a different department here and there. None of those people had progressive discipline given to them. Mr. White, in effect, really was given a lot of advantages. He was given advantages because there was an affinity between him and the company and Parley Dixon. Mr. Spohr came in. He's the outsider. He's the change agent. Nobody likes that. He comes in and what's his one job? Get the fab shop up to a level that we want for the going forward, and that's what he did. He came forward, saw what he saw, made his decisions as the expert. The fact that other people who worked in the shop may have seen things differently doesn't mean that his opinion is wrong or false or that there's been a showing that the decision-making was done in bad faith. There's no question that when he met with Parley, there were potential options on the table. There are no questions that Patriot wrote to Mr. White and wanted him to stay at the company. Consider the options of staying. He then files his certificate with the Secretary of State for a new company. I would ask the court to do this. Look in the evidence of all of the text messages and e-mails that were submitted in the court that came after that time. Every single one of them, every single one, are people from Patriot trying to help Mr. White. That's it, period. There's no record of any termination within the company, no record of somebody writing down he's been fired. And by the way, as far as leave goes, he was given leave when no one else was. Why? Because the company actually did love this person. They loved him. They didn't want to see him go, but they knew he was suffering. Yes, he had a girlfriend on campus. Yes, he had a wife that was about, he was in the middle of a big divorce. Yes, he had 11 kids. Yes, he had just had a big accident with a Patriot truck. None of those things led to his termination. Did Mr. Swore testify that he heard people complain about Mr. White? Absolutely. Do we have evidence in the record that Mr. White had a write-up about being harassing of other employees within a year or two prior to this? Absolutely. You weren't deprived of the opportunity to bring all of this forth to the jury, were you? You're not complaining about evidentiary rulings that kept out all of this evidence or anything, are you? I'm not, Your Honor. Well, the jury saw it differently. But this court has a duty to say, is there substantial evidence of pretext? We don't have a duty. That's not the legal standard. Okay. Substantial evidence of pretext is not the legal standard at this point. We have to see if there is evidence from which a reasonable jury could have decided the case in favor of the plaintiff and is there some evidence in the record. And that's why we ask the other side, did he have a job displacement? Did he have a discrimination? And so as long as there's evidence in the record, this is not a substantial evidence case against a federal agency where we have to – I mean, this is not – the standard of review is not does he satisfy substantial evidence at this point. Judge, he was not displaced in the sense that you're talking about, because a lot of people were reorganized at that time. That's what was happening with him. And he made that argument. Yes, Your Honor. And let me just finish out my thought here and say this. At the time, of course, if he's going to be moved out of that leadership position, someone else is going to be put into that position. Mr. Snyder was. Mr. Snyder is just like Mr. White. He's biracial. I don't know whether that really creates a prima facie case. That is an issue that we brought up. I don't think the evidence is sufficient for pretext. And what I mean by that is there is no evidence that – I'm sorry – that progressive discipline had to be provided in this situation. It wasn't provided to anybody else, Your Honor. And the other thing I would say is just because other people disagreed with what Mr. Swore's opinion was at that time does not show discrimination. And if the court looks at all the evidence in this case, there's nobody in the record, in the documents, anywhere from Mr. White or from Patriot that said he was being fired or terminated or let go. But he wasn't getting his money after three weeks. If we look at the evidence in the light most favorable to the verdict, you're telling me there's no evidence that indicates that his money was being cut off after three weeks. His money was not cut off after three weeks. If you look at the record, he actually got six to eight weeks of additional pay while he was going through his divorce. The company made that available to him because he was under tremendous stress, and they were trying to be generous to somebody and not discriminate against somebody and give him the better, you know, give him a shot at success at least in that, so he could come back and do the right thing for Patriot. Thank you. Thank you. You're welcome, Judge. We have your argument on this case. Thanks. And I guess it's time to have your next case.